[No. 1560.]

## J. B. PRATOR *v.* THE STATE.

1. PRACTICE—CONTINUANCE—BILL OF EXCEPTIONS.—Unless excepted to below, and the matter is brought to this court by proper bill of exceptions, the action of the trial court in refusing an application for continuance will not be revised.　A specific bill of exceptions is not supplied by a recital in the judgment that the application was refused and the defendant excepted.
2. SAME—RULE 55*a* for the District Courts provides that the rulings of the court upon applications for continuance, or for change of the venue, and other incidental motions, and upon admission and rejection of evidence, and upon other proceedings in the case not embraced in Rules 53 and 55, when sought to be complained of as erroneous, must be presented in a

bill of exceptions signed by the judge and filed by the clerk, or otherwise made according to statute, and they will thereby become a part of the record of the cause, and not otherwise.

3. Theft—Possession of Recently Stolen Property.—If the evidence in a trial for theft fails to connect the defendant with the taking of the stolen property otherwise than by recent possession, this recent possession may be accounted for by proof of purchase, whether in good or bad faith, and defendant may in law urge the purchase, notwithstanding he had full knowledge that the seller had stolen the property.

4. Same—Charge of the Court.—Defense to a prosecution for theft was purchase, upon which phase of the case the court charged, in substance, that the purchase would not entitle defendant to an acquittal, unless such purchase endowed him with an honest and *bona fide* claim to the property. *Held*, error, inasmuch as it authorizes a conviction for theft without a showing of defendant's complicity in the fraudulent taking of the property.

5. Same—Receiving Stolen Property.—That the defendant, subsequent to the theft of the property, and with knowledge that it was stolen, aided the taker to dispose of it or purchased it from the thief, are facts sufficient to support a conviction for receiving stolen property, knowing it to be stolen, but not to support a conviction for theft.

6. Practice—Evidence—Bill of Sale.—Should the evidence, in such a case as this, tend to show an acting together, conspiracy or complicity in the taking between a vendor in a bill of sale and the purchaser on trial for the theft, it would become the duty of the court to submit the *bona fides* of the bill of sale, that the jury might ascertain whether or not it was a sham or device to cover up and avoid the crime of theft.

Appeal from the District Court of Limestone. Tried below before the Hon. L. D. Bradley.

The offense of which the appellant was convicted, and for which he was awarded a term of two years in the penitentiary, was the theft of a yearling, the property of Levy Fowler. The indictment alleged the offense to have been committed in Limestone county, on the tenth day of July, 1879.

Levy Fowler was the first witness for the State. He testified that in July, 1879, he lost a blue speckled heifer yearling, which he had winter fed and gentled. It was branded 76, connected by adding a right curve to the down stroke of the figure seven. Witness had not then sold the animal or consented that any one should take her. She disappeared about the first of July, 1879. The witness turned her out some time in April, and saw her frequently thereafter, her range being in the immediate vicinity of his house, some three miles from the town of Mexia. When witness first missed her from the range, his first impression was that she had gone to hunt water, which had become

scarce in that neighborhood. Witness saw no more of the animal until the next fall, when she returned to his house and was perfectly and thoroughly identified by the witness. She had several brands when she came back. One, resembling 66B or 6JB, covered the 76 brand; another brand, J J B on the left hip; J R on the right shoulder, and on the right side she was branded LOOK OUT. The J J B brand was the brand of J. J. Beckham, to whom witness afterwards sold the animal because she was so branded. Witness did not know who took the animal.

The next witness for the State testified that he lived within two hundred yards of Levy Fowler, and knew the heifer in question well. The one that disappeared and the one which afterwards returned branded as Fowler described was one and the same.

C. T. Harris testified, for the State, that he lived in Mexia, and that in 1879 he owned a pasture, or cattle ranch, some sixteen miles west from that town. In July, 1879, the defendant brought a small herd of cattle to his, witness's, ranch for J. J. Beckham, and told witness that among Beckham's cattle was a yearling of his own, which he had picked up on the way. Having heard that defendant had cattle of his own, witness thought no more of the matter then, and did not at the time go out to look at the cattle. That night the defendant told witness that he wanted to brand his yearling in Beckham's brand, for which he would settle with Beckham. Next morning witness rode out to round up the cattle, and went to within fifty yards of a point where defendant and a negro had the calf down, in the pasture, branding it. Defendant called to witness that he had got one brand on, but got it backwards. Witness told him to try to get the next one on right. Beckham's cattle brand was on two places, the side and the hip. That day the cattle defendant brought got out, and witness and defendant went to look for them. Afterwards, on the same day, witness went to Shead's tank, and found Beckham's cattle (the same defendant had brought to the pasture), and with them a small blue speckled heifer yearling, in two fresh brands, one on the hip and one on the side. One brand was 66B, or J6B, the J backwards, and the other was J J B. Both were fresh brands.

J. J. Beckham testified, for the State, that he lived in Mexia, Limestone county, Texas. In July, 1879, he hired the defendant to take a small herd of cattle for him to C. T. Harris's ranch.

Defendant afterwards told witness that he found one of his own yearlings *en route,* which he put in witness's brand and left with witness's cattle. Witness thereupon paid him for it. Some time during the next fall witness bought of Levy Fowler a small blue speckled heifer yearling, which had his, witness's, brand on in one place and the brand 66B in another. Witness got Mr. C. T. Harris to take that animal, with others, to Ennis, and ship it out of the State. Witness never got the animal he paid defendant for, unless the animal he bought from Fowler was the same.

C. T. Harris, again sworn for the State, testified that he took the heifer yearling branded 66B, J J B, J R on the right shoulder and LOOK OUT on the right side, to Ennis.

J. C. McGilvey testified, for the defense, that he and Huse Roberts were out cattle hunting in the spring of 1882, about five miles northeast from Mexia. He saw, on that ride, a blue speckled cow, about four years old, branded on the left side 66B and on the right hip J J B. This latter is Beckham's brand, and witness took the animal to be his. Witness noticed no other brand on the animal. Huse Roberts, for the defense, testified to the same effect.

Hiram Hudson testified, for the State, that he was engaged in the cattle business, and owned quite a number of cattle, but could not say that he was a brand expert. He could, however, tell an old from a new brand. In August, 1879, witness was assisting to brand cattle for Beckham. About a mile from Harris's ranch, on Cottonwood creek, witness and party found a blue speckled heifer yearling, which had recently, within a month, been branded 66B on left side and J J B on left hip. Some one of the party put the LOOK OUT brand, in which they were branding Beckham's cattle, on her right side. She had an old J R brand, which was given by Mr. Shead, low down on her right shoulder, and witness concluded that the yearling was one that Beckham had bought from Shead. The yearling was then turned loose, and witness had not seen her since.

J. A. Gardner testified, for the defense, that he knew N. M. Freeman in 1879, and for many years after. Freeman was buying and selling cattle in Limestone county, in 1879, and no one, to witness's knowledge, ever hesitated to buy cattle of him. Witness purchased cattle from him, and still had bills of sale signed by him. Witness knew F. P. Jones. Said Jones worked for witness during the year 1879, and witness had often seen

him sign his name.   Jones left Limestone county late in 1879, or early in 1880, going to Corsicana, where he remained some months and left, and the witness understood he was going out of the State.   Witness had not heard of nor seen him since. Witness had seen Freeman write his name, and believed he would know his and Jones's signatures.   Being here shown a bill of sale, signed "N. M. Freeman" as vendor, and "F. P. Jones" as witness, testified, that in his opinion the signatures were genuine.   Witness was not an expert in handwriting, but based his opinion on having seen both write their names.   Witness could not be positive, but was decidedly of opinion that the signatures were genuine.

The defense then presented in evidence the bill of sale, which reads as follows.

"This is to certify that I have this day sold and delivered one Flea speckled heifr yearling, marked one half crop in right ear Branded 76. Title to which I warent and defend, this June 20th, 1879.

"N. M. FREEMAN.

"Witness:   F. P. JONES."

Hodges, sworn for defendant, testified that in August, 1882, he saw a blue speckled cow branded 66B on the side and J J B on the hip, four or five years old.   She was in the Harper neighborhood, near the Limestone and McLennan county line.

Hugh Henderson, constable of Limestone county, testified that he had been an employee in the sheriff's office.   He knew N. M. Freeman, who lived in Limestone county for four or five years.   Freeman was a cattle trader.   He was in Limestone county until the winter of 1881 or 1882.   He was once in attendance upon the court as a witness in this case.   Witness has been looking for him, but has not seen him since the winter named. Witness was given a *capias* for him about the time he disappeared.

The motion for new trial assailed the charge of the court, and denounced the verdict as unsupported by law or evidence.

*Burrow & Kincaid*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge.   After so many repeated decisions to the effect that the overruling of an application for a continuance will not be revised on appeal *unless a bill of exceptions was specially reserved to the ruling*, it does appear to us that it is time the rule should be understood, and that counsel and parties should no longer insist in encumbering records and briefs with such useless and worthless applications.   There never has been, that we are aware of, and never perhaps will be, an exception to this rule until and unless there is some direct legislative action ordering otherwise.

We will state the rule fully again, as it may be found enunciated in *Gaston* v. *The State*.   It is as follows: "Without a bill of exceptions reserved to the overruling of an application for a continuance, the ruling will not be revised.   A recital in the judgment that the application was overruled and defendant excepted will not answer in lieu of a specific bill of exceptions. (*Nelson* v. *The State*, 1 Texas Ct. App., 41, and authorities cited.) In the rules for the government of proceedings in the District Court it is expressly provided that the rulings of the court upon applications for continuance, and for change of venue, and other incidental motions, and upon admission and rejection of evidence, and upon other proceedings in the case not embraced in Rules 53 and 55, when sought to be complained of as erroneous, must be presented in a bill of exceptions signed by the judge and filed by the clerk, or otherwise made according to statute, and they will thereby become a part of the record of the cause, *and not otherwise.*"   (Rule 55*a; Gaston* v. *The State*, 11 Texas Ct. App., 143.)   In the face of these decisions and the rule so positive and certain, it is worse than idle to discuss questions arising upon applications for continuances not coming strictly within the rule.

On the trial the defendant introduced in evidence a bill of sale of the alleged stolen animal, executed to him by one Freeman, and there was other evidence adduced by him to the same effect as to the purchase.   Upon this phase of the defense the court instructed the jury: "3. If you believe from the evidence that defendant did take and have possession of a yearling such as has been described, and you further believe from the evidence, or have a reasonable doubt as to the same, that the yearling so taken by him was not the property of Levy Fowler, or that, if it was, he took it under an honest and *bona fide* claim of ownership by reason of its being his own property, either by

purchase from some one else or otherwise, you will find him not guilty."

This charge is complained of in the motion for a new trial, and is also assigned as error. Defendant relied upon a purchase. A fair construction of the charge is that his purchase would not entitle him to an acquittal of theft unless the purchase endowed him with an honest and *bona fide* claim to the property. Is this a correct rule of law applicable to theft? Suppose the property had been stolen by another, and defendant knew that fact, but purchased the animal notwithstanding, does that make him guilty of theft? Theft is the fraudulent *taking* of property, and to inculpate a party in the crime of theft it must be shown that he either *took*, or had some connection with, or complicity in the taking of the property. It does not suffice that, subsequent to the taking and without complicity therein, but that with a knowledge that it had been stolen, he aided the taker to dispose of it (*Cohea* v. *The State*, 9 Texas Ct. App., 173); or that he himself purchased it from the thief. Under such a supposed state of facts he might be liable for receiving stolen property, knowing it to be stolen, but not of theft. As was said in McAfee's case: "If the evidence fails to connect defendant with the *taking*, unless by recent possession, this recent possession may be accounted for by proof of purchase, whether in good or bad faith, and defendant may, in *law*, urge the purchase, notwithstanding he had full knowledge that the seller had stolen the property." (*McAfee* v. *The State*, 14 Texas Ct. App., 668; *Clayton alias Cobb* v. *The State*, just decided; *ante*, 348.)

If the evidence should tend to show an acting together, conspiracy or complicity in the *taking*, between the vendor in a bill of sale and a defendant charged with the theft, then, indeed, it would not only be right but highly proper for the court to submit the *bona fides* of the bill of sale, that the jury might ascertain and find whether or not it was a sham or device conceived to cover up and avoid the crime of theft. (Clark's Crim. Law of Texas, p. 262 and note.)

Other errors are assigned, but they are not presented on the record in a manner requiring a discussion by us. Because we are of opinion that the court erred in the paragraph of the charge above quoted, and that said charge was not only calculated to

mislead the jury but also to prejudice the rights of defendant, the judgment is reversed and the cause remanded.

Opinion delivered February 2, 1884.